UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JAWAD AMIR MUSA,<br><br>　　　　　　　　　Petitioner,<br><br>　　-v-<br><br>UNITED STATES OF AMERICA,<br><br>　　　　　　　　　Respondent. | No. 19-cv-9130 (RJS)<br><u>OPINION AND ORDER</u> |
| JAWAD AMIR MUSA,<br><br>　　　　　　　　　Petitioner,<br>　　-v-<br>UNITED STATES OF AMERICA,<br><br>　　　　　　　　　Respondent. | No. 97-cv-2833 (RJS)<br><u>OPINION AND ORDER</u> |
| UNITED STATES OF AMERICA<br><br>　　-v-<br><br>JAWAD AMIR MUSA,<br><br>　　　　　　　　　Defendant. | No. 90-cr-863 (RJS)<br><u>OPINION AND ORDER</u> |

<u>RICHARD J. SULLIVAN</u>, Circuit Judge:

　　Defendant Jawad Amir Musa has filed three motions seeking collateral relief from his term of life imprisonment.  With the aid of counsel, Musa moves for compassionate release under the First Step Act of 2018, 18 U.S.C. § 3582(c)(1)(A).  (Doc. No. 303.[1])  Musa argues principally that his sentence is unfairly long given both recent sentencing law reforms and his rehabilitation over the intervening decades.  (Doc. No. 304 at 3–5 ("Musa Br.").)  Separately, Musa moves *pro se* to

---

[1] Unless otherwise indicated, all record citations are to docket No. 90-cr-863, and references to page numbers correspond to the page numbers provided in the ECF legend atop the filing, not to the filing's own pagination.

reopen his original habeas petition under Federal Rule of Civil Procedure 60(b) in light of the decision in *United States v. Holloway*, 68 F. Supp. 3d 310 (E.D.N.Y. 2014).  (Doc. No. 276.)  Lastly, Musa has filed a new *pro se* habeas petition, arguing that a recent statistical assessment conducted by the U.S. Sentencing Commission demonstrates that he was subjected to a recidivism enhancement solely because of his race.  (Doc. No. 338.)  The government opposes Musa's motions for compassionate release and to reopen his original habeas petition.  (Doc. No. 286; Doc. No. 311 ("Gov't Br.").)  The government has not taken a position on the merits of Musa's new *pro se* habeas petition.  For the reasons set forth below, Musa's requests for compassionate release and to reopen his original habeas petition are DENIED, and his new *pro se* habeas petition, which is successive, is transferred to the United States Court of Appeals for the Second Circuit.

## I. Background

### A.  Musa's Underlying Crime & Conviction

This case began with a drug deal in midtown Manhattan nearly three decades ago.  In November 1990, an undercover confidential informant, posing as a drug dealer, offered to sell a kilogram of heroin to a man name David Wray.  *See Moses v. United States*, No. 97-cv-2833 (RPP), 1998 WL 255401, at *1 (S.D.N.Y. May 20, 1998).  Though Wray was interested, he was short the $20,000 he needed for the deal's down payment and turned to a contact, Sean Brockington, for help.  *Id.*; *United States v. Moses*, No. 90-cr-863 (RPP), 1993 WL 128009, at *1 (S.D.N.Y. Apr. 16, 1993).  Brockington, in turn, reached out to Musa, who agreed to provide the $20,000.  *Moses*, 1998 WL 255401, at *1.  From that point on, Musa controlled the direction of the deal.  *See id.* at *2; *Moses*, 1993 WL 128009, at *3.

But Musa did not trust Wray, so additional conspirators were soon brought into the transaction.  *See Moses*, 1993 WL 128009, at *3.  One was Norman Ransom, whose job was to

"keep a close eye on Wray" and to facilitate the sale. *Id.* Another was Carmelita Grant, who was tasked with handling the money. *Id.* at *2. Musa also asked Brockington to accompany him to provide "further protection against a 'rip off.'" *Id.* at *3.

Once formed, the group of conspirators drove from Baltimore to Manhattan to complete the deal. *See Moses*, 1998 WL 255401, at *2. Upon their arrival, Musa handed Grant the $20,000 and directed Ransom, who had a gun, to frisk Wray. *Id.* Wray, Ransom, and Grant then went to meet the supplier – who, as noted above, was actually an undercover confidential informant working with law enforcement – at a gas station, while Musa and Brockington waited nearby in a Mercedes-Benz. *Id.*; Doc. No. 279-1 at 4. The plan was for Ransom to receive the drugs and give them to Grant, who was then supposed to return to Baltimore by train. *Moses*, 1993 WL 128009, at *2. But as the money was about to be exchanged, the confidential informant signaled to nearby government agents, who quickly swooped in and arrested the three conspirators engaged in the sale. *See Moses*, 1998 WL 255401, at *2. Musa watched this unfold from his car and quickly fled the scene, but not before throwing his own gun out of his car window. *Id.* Though the police gave chase, they were unable to catch Musa. It was not until law enforcement agents were able to track Musa down in Baltimore that he was finally apprehended. *Id.*

Following his arrest, Musa was indicted on one count of conspiring to possess, with intent to distribute, one kilogram or more of heroin, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A), a crime that carried a minimum sentence of ten years' incarceration and a maximum sentence of life imprisonment. *Id.* at *1; Doc. No. 279-1 at 4. Despite the prospect of facing at least a decade in prison if convicted, Musa turned down the government's plea offer and chose instead to exercise his right to trial. (Musa Br. at 5.) In light of Musa's decision, the government filed a prior felony information pursuant to 21 U.S.C. § 851, based on Musa's two previous state-court drug

3

convictions.[2]  (*Id.* at 5–6.)  As a result of the filing, the mandatory minimum sentence that Musa would receive if convicted at trial increased to life imprisonment.  (*Id.* at 6; Doc. No. 279-1 at 4.)

In July 1991, a jury convicted Musa of conspiring to possess heroin with intent to distribute. *Moses*, 1998 WL 255401, at *1.  Judge Patterson, who presided over the trial, later held a sentencing hearing, after which he found "by a preponderance of the evidence that . . . Musa knew that he was engaging in a conspiracy to possess, with intent to distribute, a kilogram of heroin." *Moses*, 1993 WL 128009, at *3.  Thereafter, on May 5, 1993, Judge Patterson sentenced Musa to a term of life imprisonment as required by 21 U.S.C. §§ 841(b)(1)(A) and 851.  (Doc. No. 129.) The Second Circuit affirmed Musa's conviction on direct appeal (Doc. No. 138), and Judge Patterson denied Musa's original habeas petition in May 1998 (Doc. No. 175).

In the decades since then, Musa has filed numerous successive motions with the district court and Court of Appeals seeking to have his conviction and sentence overturned.  All have been denied.  (*See, e.g.*, Doc. Nos. 182, 188, 190, 195, 228, 230, 238, 246, 254, 255, 258, 259, 267, 268, 270.)

**B.     Musa Seeks Clemency**

In May 2016, Musa sought clemency from the Office of the Pardon Attorney of the Department of Justice.  (Gov't Br. at 7.)  In support of his petition, Musa submitted a letter purportedly authored by "Captain M. Earwin" of USP Florence, the facility at which Musa is incarcerated (the "Earwin Letter").  (*Id.*; Doc. No. 311-1.)  Approximately eight months later, the Office of the Pardon Attorney denied Musa's petition – at a time when President Obama was

---

[2] The first conviction involved Musa's possession of cocaine in 1984, for which he was sentenced to five years' imprisonment.  (Musa Br. at 6 n.3.)  Within a year of his release from prison, Musa was arrested again, this time for possession of cocaine and a gun.  (*Id.*)  Before that case was adjudicated, Musa was arrested yet again for possession of cocaine.  (*Id.*)  The two cases were consolidated, and Musa was ultimately convicted and sentenced to four years' imprisonment for possession of drugs and a firearm.  (*Id.*)

granting commutations to hundreds of individuals, many of whom, like Musa, were serving long sentences for narcotics convictions.[3]  *See* Gov't Br. at 7; Neil Eggleston, *The Reinvigoration of the Clemency Authority*, THE WHITE HOUSE BLOG (Jan. 19, 2017, 2:25 PM) ("The President has now granted commutation to a total of 1,715 individuals, . . . [t]he vast majority of [whom] are serving unduly long sentences for drug crimes.  With today's action, the President has granted more commutations than any president in this nation's history and has surpassed the number of commutations granted by the past 13 presidents combined.")[4]; *see also Simmtech Co. v. Barclays Bank plc* (*In re Foreign Exch. Benchmark Rates Antitrust Litig.*), 74 F. Supp. 3d 581, 588 n.4 (S.D.N.Y. 2015) (explaining that "[c]ourt[s] may take judicial notice of the press releases of government agencies" (quoting *McLoughlin v. People's United Bank, Inc.*, 586 F. Supp. 2d 70, 73 (D. Conn. 2008)).

## C.        The Pending Motions for Relief

On February 10, 2017, only weeks after his clemency petition was denied, Musa filed a *pro se* motion seeking to reopen his original habeas petition.  (Doc. No. 276.)  The motion is styled as one for "relief from final judgment to reopen §2255 motion pursuant to Fed.R.Civ.P. 60(b)(6) and *United States v. Holloway*, 68 F.Supp.3d 310 (E.D.N.Y. 2014) or alternatively through a writ of audita querela or coram nobis under the all writs act, 28 U.S.C. § 1651(a)."  (*Id.* at 1.)  Musa argues principally that he should be permitted to reopen his habeas petition because of the non-binding decision of a district court judge in the Eastern District of New York in an unrelated case. (*Id.* at 3–4.)  In support of his argument, Musa asserts that "[t]he Captain at USP, Florence has . . .

---

[3] The parties have not indicated whether the Pardon Attorney provided an explanation for its denial.  But according to the Department of Justice, when reviewing requests for a commutation, the Pardon Attorney considers the "disparity or undue severity of [the] sentence" along with "other equitable factors (such as [the petitioner's] demonstrated rehabilitation while in custody or exigent circumstances unforeseen by the court at the time of sentencing)."  U.S. Dep't of Just., Just. Manual §9-140.113 (2018).

[4] Available at https://obamawhitehouse.archives.gov/blog/2017/01/19/reinvigoration-clemency-authority.

endorsed [his] release," citing to the Earwin Letter, which he attached as an exhibit to his motion. (*Id.* at 16; *see also id.* at 60.)

Over the ensuing months, Musa's counsel wrote several letters to the Acting United States Attorney for the Southern District of New York, arguing that Musa's life sentence was unjust and urging the U.S. Attorney's Office to consider vacating Musa's sentence and prior felony informations so that this Court could resentence Musa – essentially, the same relief Musa requests in his *pro se* Rule 60(b) Motion. (*See, e.g.*, Doc. No. 279.) As part of that correspondence, Musa's counsel – John Gleeson, a former judge in the Eastern District of New York, and the author of the *Holloway* decision referenced in Musa's Rule 60(b) motion – provided the government with the Earwin Letter, along with other letters in support of Musa's release. (Doc. No. 279-1 at 18.) Eventually, in November 2017, the government informed Musa that while it was "sympathetic to the spirit of [his] request," there was "no lawful basis to authorize the requested post-sentencing relief." (Doc No. 286 at 1.) In response, Musa filed a *pro se* reply brief in further support of his Rule 60(b) motion. (Doc. No. 287.)

A little over a year later, in January 2019, Musa requested a hearing on his pending motion. (Doc. No. 288.) Shortly thereafter, an attorney for the Bureau of Prisons ("BOP") provided the government with a declaration from Eric Earwin, the former captain at USP Florence, indicating that Earwin "did not sign []or draft" the Earwin Letter. (Doc. No. 311-2 at 2.) Earwin later provided the government with a supplemental declaration, which further clarified that while Musa asked him to write a letter in support of Musa's application for clemency, he "did not agree to write for Musa" or "authorize anyone else to write for Musa under [his] name." (Doc. No. 311-3 at 2.) For his part, Musa forcefully rejects any assertion that he forged the Earwin Letter. (*See* Musa Br. at 15–16 (asserting that "Earwin authorized the mailing of the letter to both the Pardon

Attorney and this Court"); Doc. No. 335 at 10; *see also* Doc. No. 334 (requesting an evidentiary hearing on the issue).)  Musa's counsel and the government met several times to discuss the authenticity of this letter and its impact on Musa's requests for relief, but the parties were unable to reach an agreement.  (Gov't Br. at 8–9; Doc. No. 335 at 10.)

On May 31, 2019, Musa withdrew his still-pending request for a hearing on his Rule 60(b) motion (though not the motion itself or the Earwin Letter, which is affixed thereto) and filed, with the aid of counsel, a motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A).  (Doc. Nos. 302, 303; Gov't Br. at 9.)  In support of his motion, Musa argues broadly that four factors, when considered holistically, indicate that "extraordinary and compelling reasons" warrant his release and that such relief is consistent with the purposes of sentencing.  First, Musa asserts that he has served more than enough time given the nature and circumstances of his offense and that the purposes of sentencing have been satisfied.  (Musa Br. at 13, 16–17.)  Second, he contends that the § 851 enhancement that resulted in his mandatory life imprisonment would carry only a 25-year minimum sentence if he were sentenced today and that he is otherwise deserving of mercy. (*Id.* at 16 n.8, 19–20.)  Third, Musa maintains that the government used the § 851 enhancement as a means of punishing him for refusing to plead guilty and notes that such enhancements have historically been disproportionately employed against minorities such as himself.  (*Id.* at 17–19.) And fourth, Musa argues that he has rehabilitated himself during his nearly 30 years of incarceration and that he is ready to become a productive member of society.  (*Id.* at 12–13.)  In addition, Musa has since submitted two letters to the Court arguing that "there is added exigency to securing [his] immediate release" given "the ongoing COVID-19 pandemic."  (Doc. No. 353 at 2; *see also* Doc. No. 365.)

The government opposes Musa's motion.  (Doc. Nos. 311, 366.)  It argues principally that the Court lacks the statutory authority to declare Musa's proffered reasons to be extraordinary and compelling.[5]  (Gov't Br. at 13–15.)  And even if the Court did have such authority, the government argues that Musa does not warrant compassionate release.  (*Id.* at 18–20.)  Lastly, the government rejects Musa's assertion that COVID-19 presents extraordinary and compelling circumstances, arguing that Musa has made no showing that he is at particular risk of serious complications should he contract the disease.  (Doc. No. 366.)

In September 2019, while his compassionate release motion was pending, Musa filed yet another *pro se* request for relief – a new habeas petition.  (Doc. No. 338.)  In short, Musa argues that the government violated his equal protection and due process rights because it engaged in a pattern of disproportionately enforcing § 851 enhancements against Black offenders such as himself.  (*Id.* at 5–6.)  Musa relies principally on a U.S. Sentencing Commission report released in July 2018, which Musa says he first discovered upon seeing it cited in his counseled memorandum of law in support of his motion for compassionate release.  (*Id.* at 13–14.)  According to that report, which analyzed the outcomes for all § 851 enhancement-eligible offenders during the 2016 fiscal year, "eligible Black offenders received the enhancement more frequently than any other racial group."  U.S. Sentencing Comm'n, *Application and Impact of 21 U.S.C. § 851:  Enhanced Penalties for Federal Drug Trafficking Offenders* at 36 (July 2018) (the "July 2018 Report").[6] Musa has moved for counsel to be appointed to assist with this motion.  (Doc. No. 339.)

---

[5] As explained below, the government has since abandoned this argument in light of intervening Second Circuit precedent.  (Doc. No. 370.)

[6] Available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2018/ 20180712_851-Mand-Min.pdf.

## II.  Discussion

**A.      Compassionate Release**

**1.        The Compassionate Release Framework**

"A court may not modify a term of imprisonment once it has been imposed except pursuant to statute."  *United States v. Gotti*, 433 F. Supp. 3d 613, 614 (S.D.N.Y. 2020). "Section 3582(c)(1)(A) provides one such exception, often referred to as 'compassionate release.'" *United States v. Ogarro*, No. 18-cr-373 (RJS), 2020 WL 1876300, at *2 (S.D.N.Y. Apr. 14, 2020). Under that provision, a court may reduce a defendant's sentence where he proves that certain conditions are met.  *See id.*

To start, the defendant must demonstrate that "extraordinary and compelling reasons warrant such a reduction."  18 U.S.C. § 3582(c)(1)(A)(i); *see also United States v. Ebbers*, 432 F. Supp. 3d 421, 426 (S.D.N.Y. 2020) (explaining that the defendant bears the burden of making this showing).  Guidance as to what circumstances meet this standard is not found within the compassionate release statute itself.  Instead, Congress has historically delegated that authority to the Sentencing Commission.  *See* 28 U.S.C. § 994(t) (providing that the Commission "shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples"); *see also Ebbers*, 432 F. Supp. 3d at 427.

The Sentencing Commission's policy statement on this topic is contained in U.S.S.G. § 1B1.13 and five accompanying "Application Notes."  One of those notes, Application Note 1, describes the various circumstances that the Sentencing Commission has determined can constitute

"extraordinary and compelling reasons" justifying a sentencing reduction.[7]   Subsections (A) through (C) of that note set forth three such instances:  (1) the defendant is suffering from a significant medical condition, including terminal illness or serious cognitive impairment; (2) the defendant is at least 65 years old and, among other things, is experiencing age-related deterioration; and (3) the defendant is the only available caregiver for his children or incapacitated spouse.  U.S.S.G. § 1B1.13, n.1(A)–(C).   Subsection (D) provides a fourth, catchall category entitled "Other Reasons," which acknowledges the propriety of a sentencing reduction where:

> As determined by the Director of the [BOP], there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

*Id.* at n.1(D).

But even where a defendant has demonstrated that "extraordinary and compelling reasons warrant . . . a reduction," the court must still consider the objectives of sentencing set forth in 18 U.S.C. § 3553(a).  18 U.S.C. § 3582(c)(1)(A).   In this context, the § 3553(a) factors provide a counterweight to "extraordinary and compelling reasons" calling for a reduction of the defendant's sentence.  Put differently, the § 3553(a) factors are assessed to determine whether they "outweigh the 'extraordinary and compelling reasons' warranting compassionate release, particularly whether compassionate release would undermine the goals of the original sentence." *Ebbers*, 432 F. Supp. 3d at 430–31; *see also United States v. Rosa*, No. 11-cr-569 (PAC), 2020 WL 6075527, at *3 (S.D.N.Y. Oct. 15, 2020) (denying compassionate release despite the presence of "extraordinary

---

[7] Other Application Notes provide additional guidance for identifying "extraordinary and compelling reasons."  For instance, Application Note 3 clarifies that though a defendant's rehabilitation may be considered as part of his request for release, rehabilitation "is not, by itself, an extraordinary and compelling reason" calling for compassionate release.  U.S.S.G. § 1B1.13, n.3.  In addition, Application Note 2 provides that "an extraordinary and compelling reason need not have been unforeseen at the time of sentencing in order to warrant a reduction in the term of imprisonment." *Id.* at n.2.

and compelling reasons" because the § 3553(a) factors did not favor such relief); *United States v. Agostini*, No. 00-cr-237 (VM), 2020 WL 6047362, at *2 (S.D.N.Y. Oct. 13, 2020); *United States v. Daugerdas*, --- F. Supp. 3d ---, 2020 WL 2097653, at *4 (S.D.N.Y. May 1, 2020).

Until recently, a court could not order compassionate release unless the BOP made an affirmative request on a prisoner's behalf. That changed in December 2018, with the passage of the First Step Act. *See Ogarro*, 2020 WL 1876300, at *2.

Under the revised compassionate release language, a prisoner may now bring such a motion himself so long as he has satisfied certain procedural requirements not at issue here. *See* 18 U.S.C. § 3582(c)(1)(A). But, as is often the case, the gears of the federal bureaucracy do not all turn at the same speed. In this instance, the laggard is the Sentencing Commission, which has not had a quorum for several years, and therefore has not updated the Sentencing Guidelines to reflect the First Step Act's changes.[8] As a result, though they are not entirely "anachronistic," portions of the Guidelines are indisputably out-of-sync with the current statutory scheme. *See Ebbers*, 432 F. Supp. 3d at 427. For example, the opening sentence of § 1B1.13 continues to assume that a compassionate release motion must be filed by the BOP. *See* U.S.S.G. § 1B1.13 ("Upon motion of the Director of the Bureau of Prisons . . . .").

### 2.      Judicial Authority to Identify Extraordinary & Compelling Reasons

The initial point of disagreement between the parties concerns the Court's authority to identify "extraordinary and compelling reasons" meriting compassionate release. Musa does not argue that he falls within one of the three specifically delineated categories described in Application Note 1 of § 1B1.13: serious illness, old age, or caregiver status. Musa instead seeks

---

[8] *See* U.S. Sentencing Comm'n, *2019 Annual Report* at 3 (2019) (noting that "[t]hroughout much of fiscal year 2019 and into fiscal year 2020 . . . the Commission has lacked the minimum of four affirmative votes required by statute to promulgate amendments to the federal sentencing guidelines"), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2019/2019-Annual-Report.pdf.

to take advantage of the catchall, "Other Reasons" category.  There is just one problem:  according to § 1B1.13, only the BOP is authorized to identify such "Other Reasons."  U.S.S.G. § 1B1.13, n.1(D).

Musa nevertheless contends that § 1B1.13 does not constrain the Court's discretion here.  Although Musa does not say that § 1B1.13 is entirely inapplicable, he argues that the First Step Act eliminated the BOP's gatekeeping function with respect to identifying circumstances that constitute "extraordinary and compelling reasons" calling for compassionate release.  In effect, Musa asserts that the Court has the authority to identify "extraordinary and compelling reasons" under the catchall category, notwithstanding the Guidelines' assumption that the BOP will make that decision.  (Musa Br. at 10.)

The government disagrees.  It argues that § 1B1.13 means what it says and is binding on the Court.  According to the government, the First Step Act granted inmates the ability to bring a compassionate release motion without BOP assistance, but did not alter the substantive standards for what reasons qualify as "extraordinary and compelling."  More to the point, the government argues that the First Step Act did not change *who* may identify additional "extraordinary and compelling reasons" beyond the three specific circumstances set forth in Application Note 1 to § 1B1.13.  Under this view, the BOP is the only entity empowered to determine whether Musa's application sets forth "extraordinary and compelling reasons" for release.

While courts around the country have split on this issue, the Second Circuit recently adopted the position pressed by Musa.  In *United States v. Brooker* (*Zullo*), the Second Circuit held that "Guideline § 1B1.13 . . . is clearly outdated and cannot be fully applicable" to all compassionate release motions.  976 F.3d 228, 235 (2d Cir. 2020).  But rather than "abolish[]" the Guideline provision in its entirety (or even portions of the provision), the Court "read the Guideline

as surviving, but now applying only to those motions that the *BOP* has made." *Id.* at 235–36 (emphasis added). So, as a result, "[n]either Application Note 1(D), nor anything else in the now-outdated version of Guideline § 1B1.13, limits [a] district court's discretion" to identify what facts constitute extraordinary or compelling reasons deserving of compassionate release. *Id.* at 237. In light of this intervening precedent, the government has abandoned its argument that the Court lacks the authority to grant Musa compassionate release. (Doc. No. 370.)

### 3.     Whether Extraordinary & Compelling Reasons Merit Musa's Release

With the Court's authority now clear, all that is left to do is assess the merits of Musa's application. Musa's primary contention is simple: his sentence was unfairly long from inception, a fact that has only grown clearer with the passage of the First Step Act. In other words, the First Step Act's reduction of the mandatory minimum sentence applicable to Musa's crime, lowering it from life to 25 years, *see* Pub. L. No. 115-391, § 401(a)(2), 132 Stat. 5194, 5220 (2018), demonstrates "extraordinary and compelling reasons" meriting relief. But the issue is not that simple. After all, Congress chose not to make this sentencing change retroactive. *See id.* § 401(c), 132 Stat. at 5221. How, then, should the Court interpret the disparity in the length of Musa's life imprisonment with the much lower sentence he would receive today?

From the outset, the Court concludes that this change in the law is not enough, standing alone, to automatically merit Musa's release. Indeed, it would be difficult to conclude that the mere existence of a disparity in sentencing is alone extraordinary when Congress itself chose to permit such a disparity to continue. At the same time, however, the Court's discretion is obviously not constrained by the non-retroactive nature of the changes, nor will the Court blind itself to the First Step Act's sentencing reforms when assessing Musa's application. *See Zullo*, 976 F.3d at 237–38 ("The only statutory limit on what a court may consider to be extraordinary and

13

compelling is that rehabilitation *alone* shall not be considered an extraordinary and compelling reason." (internal alterations, quotation marks, and footnotes omitted)); *see also United States v. Fuller*, No. 09-cr-274 (CS), 2020 WL 5849442, at *2 (S.D.N.Y. Oct. 1, 2020) ("Congress chose not to make the provision retroactive, but I will assume I can consider it in analyzing extraordinary and compelling circumstances." (internal citation omitted)).  With these principles in mind, the Court concludes that the recent changes in the law support Musa's application, but that discretionary relief is not warranted because Musa has failed to identify additional, individualized factors justifying his release.  *See, e.g.*, *United States v. O'Bryan*, No. 96-10076 (JTM), 2020 WL 869475, at *1–2 (D. Kan. Feb. 21, 2020); *United States v. Redd*, 444 F. Supp. 3d 717, 720–21 (E.D. Va. 2020) (acknowledging that although the First Step Act did not make changes to 18 U.S.C. § 924(c) retroactive, it "increased the opportunity for defendants to obtain a reduction in their sentence based on an individualized consideration under designated criteria"); *cf. United States v. Haynes*, 456 F. Supp. 3d 496, 516 (E.D.N.Y. 2020) (explaining that "the Congressional decision not to make the § 924(c) change retroactive spares the courts an avalanche of applications and inevitable re-sentencings, no doubt in many cases that do not feature the same grave characteristics presented here").[9]

For starters, Musa has not demonstrated a prolonged track record of rehabilitation that would merit compassionate release (indeed, just the opposite).  Between August 1991 and July 2015, Musa accumulated more than 60 disciplinary infractions while in BOP custody,

---

[9] Musa also notes that his § 851 enhancement was likely the product of his having exercised his right to trial.  (Musa Br. at 17.)  But while some might find such practice distasteful, the Supreme Court has stated in no uncertain terms that the government is free to confront a defendant who refuses to plead guilty in advance of trial with more severe charges.  *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978); *see also United States v. Stanley*, 928 F.2d 575, 581 (2d Cir. 1991).  Thus, Musa would be hard pressed to argue that this fact alone demonstrates extraordinary circumstances demanding that his lawfully imposed sentence be shortened.  The Court therefore determines that this argument offers little persuasive value beyond those concerning the First Step Act's sentencing reforms.

including one for "[t]hreatening [b]odily [h]arm." (Doc. No. 305-8 at 9–14.) To be sure, the bulk of these infractions relate to drug use, an addiction that Musa states he has since defeated. (Doc. No. 305-2 at 2.) But while Musa's sobriety is certainly an achievement worth celebrating, that does not mean that the Court should disregard his more than two decades of less-than-model behavior.

As a result of his habitual non-compliance with prison rules, Musa is distinguishable from defendants in many of the cases on which he relies. For instance, Judge Preska recently granted compassionate release to a defendant based in part on his having "only three minor disciplinary violations over the course of his almost 30 years behind bars." *United States v. Millan*, No. 91-cr-685 (LAP), 2020 WL 1674058, at *11 (S.D.N.Y. Apr. 6, 2020). Similarly, earlier this year, Judge Dearie granted compassionate release to a defendant who had only five disciplinary events during his nearly three decades of incarceration, all but two of which occurred before 1996. *See Haynes*, 456 F. Supp. 3d at 503–05; *but see id.* at 505 (noting that one of those infractions was for "possession of a dangerous weapon"). Many other recent opinions granting compassionate release involved defendants with similarly short disciplinary records while in custody. *See, e.g.*, *United States v. Fisher*, No. 83-cr-150 (PAC), 2020 WL 5992340, at *7 (S.D.N.Y. Oct. 9, 2020) (noting that the defendant's "clean disciplinary record" weighed in favor of compassionate release); *United States v. Britton*, No. 17-cr-260 (LTS), 2020 WL 4586799, at *1 (S.D.N.Y. Aug. 10, 2020) (remarking on the defendant's "unblemished disciplinary record while confined"); *United States v. Pena*, 459 F. Supp. 3d 544, 552 (S.D.N.Y. 2020) (granting compassionate release where the defendant had no disciplinary events during his five years in custody). Here, by contrast, Musa's many years of continued misbehavior do not show the same prolonged record of rehabilitation. In

assessing all the information before it, the Court concludes that this fact alone undermines Musa's application.

The Court also notes that Musa has at times downplayed his responsibility for his serious crimes. For instance, as recently as November 2017, Musa proclaimed his innocence of one of the convictions underlying his § 851 enhancement. (Doc. No. 287 at 2–3 ("Petitioner was the oldest child of two kids and to keep his mother from going to jail Petitioner was selected and volunteer[ed] to plead to the charges although the drugs did not belong to Petitioner.").) While not dispositive, Musa's selective acceptance of responsibility is surely relevant to the Court's exercise of discretion under the First Step Act. *See Millan*, 2020 WL 1674058, at *8 (noting that "accept[ance] [of] responsibility" may be considered in assessing whether to grant compassionate release).

Even more troubling is the government's assertion that Musa forged the Earwin Letter. (Gov't Br. at 22–24.) Setting aside whether Earwin's recounting of the events is accurate – and the Court has no reason to disbelieve Earwin's sworn declarations that he never signed or authorized this letter – his statements call into question one of Musa's most pointed arguments for relief: that he has "earned the praise of the BOP staff that know him." (Doc. No. 291 at 2.) So, at best, Musa's application is unsupported by the former captain of his prison (whom Musa specifically asked to write a letter on his behalf), while at worst Musa has attempted to defraud the Court.[10]

Musa's arguments concerning COVID-19 are equally unpersuasive. In short, Musa argues that he is at acute risk of complications should he contract COVID-19 because of his failing health.

---

[10] Although the Court can decide Musa's pending motions without determining whether the Earwin Letter was forged, the authenticity of this letter and Musa's role in procuring it may be relevant to any future motion for compassionate release filed by Musa.

Specifically, Musa asserts that he (i) has been diagnosed with Glaucoma and has been experiencing vision loss; (ii) tore his lateral meniscus; and (iii) is a former smoker.  (Doc. No. 365.)  But Glaucoma and a torn meniscus are entirely unrelated to COVID-19 and do not move the needle in terms of Musa's risk profile should he contract the disease.  (*See* Doc. No. 366 at 2 (noting that "neither condition is listed as a high-risk factor by the Center for Disease Control and Prevention").)  As for his history of smoking, "Musa's medical records . . . are unclear as to when, to what extent, or even whether he ever smoked."  (*Id.* (pointing out that one of the pages in Musa's medical file lists him as a "Never Smoker").)   And, in any event, courts in this circuit have concluded that the mere assertion that a defendant is a former smoker is insufficient to merit release.  *See, e.g.*, *United States v. Elliott*, No. 17-cr-128 (ARR), 2020 WL 4381810, at *4 (E.D.N.Y. July 31, 2020) (collecting cases).  Ultimately, Musa is left only with the argument that he should be released because there is a COVID-19 outbreak nationwide.  But "the pandemic itself – without more – does not present extraordinary and compelling circumstances warranting a compassionate release."  *United States v. Felix*, No. 12-cr-322 (RJS), 2020 WL 4505622, at *2 (S.D.N.Y. Aug. 4, 2020) (collecting cases); *accord United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020) (explaining that "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release").

For all these reasons, the Court concludes that Musa has not made a sufficient showing to merit compassionate release.  Though the disparity in Musa's sentence measured against offenders sentenced after passage of the First Step Act may seem unfair, that disparity was clearly contemplated by Congress when it decided not to make the Act's sentencing reforms retroactive. More importantly, Musa has not identified other individualized factors warranting a reduction in sentence under the First Step Act.

B.      **Habeas Petitions**

1.      **Applicable Law**

Section 2255 enables a prisoner who was sentenced by a federal court to petition that court to vacate, set aside, or correct the sentence on the grounds that it "was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack."  28 U.S.C. § 2255(a).  Relief under § 2255 is generally available "only for a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes a fundamental defect which inherently results in a complete miscarriage of justice." *United States v. Bokun*, 73 F.3d 8, 12 (2d Cir. 1995) (internal quotation marks omitted).

"Because collateral challenges are in tension with society's strong interest in the finality of criminal convictions, the courts have established rules that make it more difficult for a defendant to upset a conviction by collateral, as opposed to direct, attack." *Yick Man Mui v. United States*, 614 F.3d 50, 53 (2d Cir. 2010) (internal quotation marks omitted).  Additional limitations were put in place by the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. 104-132, 110 Stat. 1214 (1996) (the "AEDPA").

One such rule is the AEDPA's bar on successive petitions absent approval from the appropriate Court of Appeals.  *See* 28 U.S.C. § 2255(h); *see also McPherson v. United States*, No. 19-cv-8635 (WHP), 2020 WL 2765914, at *3 (S.D.N.Y. May 28, 2020) ("As a general rule, a petitioner cannot file a 'second or successive' § 2255 motion in a district court without prior authorization from the appropriate court of appeals.").  Though the statute does not define "second or successive," "[c]ourts have uniformly rejected a literal reading of the phrase." *Thai v. United States*, 391 F.3d 491, 494 (2d Cir. 2004) (collecting cases).  "Generally, a § 2255 petition is 'second

or successive' if a prior § 2255 petition, raising claims regarding the same conviction or sentence, has been decided on the merits." *Corrao v. United States*, 152 F.3d 188, 191 (2d Cir. 1998). "This remains true even if the latter petition purports to raise new claims." *Id.* On the other hand, numerically second petitions are not necessarily "successive." One such example is for claims that "could not have been raised in a prior petition" because the factual predicate underlying the claim had not yet occurred. *James v. Walsh*, 308 F.3d 162, 168 (2d Cir. 2002).

Another rule implemented by the AEDPA is that habeas petitions must be brought in a timely fashion. Section 2255 "imposes a one-year statute of limitations on motions to set aside sentences imposed . . . 'in violation of the Constitution or laws of the United States.'" *United States v. Wright*, 945 F.3d 677, 683 (2d Cir. 2019) (quoting 28 U.S.C. § 2255(a), (f)). "This one year runs from the last of a number of triggering events," *id.* (internal quotation marks omitted), including "the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence," 28 U.S.C. § 2255(f)(4). As the Second Circuit has made clear, § 2255(f)(4) "is not a tolling provision that extends the length of the available filing time by excluding certain periods that post-date the start of the limitations clock." *Wims v. United States*, 225 F.3d 186, 190 (2d Cir. 2000). "Rather, it resets the limitations period's beginning date, moving it from the time when the conviction became final to the later date on which the particular claim accrued." *Id.* (internal citations omitted).

Finally, the procedural default rule bars "claims that could have been brought on direct appeal from being raised on collateral review absent cause and prejudice." *Yick Man Mui*, 614 F.3d at 54. In other words, "to raise a claim that could have been raised on direct appeal, a § 2255 petitioner must show cause for failing to raise the claim at the appropriate time and prejudice from the alleged error." *Id.* (quoting *Marone v. United States*, 10 F.3d 65, 67 (2d Cir. 1993)).

To warrant an evidentiary hearing on such a petition, a petitioner "need establish only that he has a plausible claim . . . , not that he will necessarily succeed on the claim." *Puglisi v. United States*, 586 F.3d 209, 213 (2d Cir. 2009) (internal quotation marks omitted).  Moreover, where the petitioner is proceeding *pro se*, he is "generally . . . entitled to a liberal construction of [his] pleadings, which should be read to raise the strongest arguments that they suggest."  *Green v. United States*, 260 F.3d 78, 83 (2d Cir. 2001) (internal quotation marks omitted).  Nevertheless, a court may summarily dismiss a § 2255 motion "[i]f it plainly appears from the face of the motion and any annexed exhibits and the prior proceedings in the case that the moving party is not entitled to relief."  *Armienti v. United States*, 234 F.3d 820, 823 (2d Cir. 2000) (internal quotation marks omitted).

### 2.  Musa's Rule 60(b) Motion

Musa seeks to reopen his original habeas petition because of the decision in *United States v. Holloway*.[11]  (Doc. No. 276.)  Regardless of the procedural avenue Musa seeks to use – by way of Rule 60(b) or by one of several writs – he has not set forth meritorious grounds for vacating the denial of his petition.

As a threshold matter, it appears that Musa's Rule 60(b) motion is in fact a successive habeas petition in disguise.  Where a purported Rule 60(b) motion "attacks the integrity of a previous habeas proceeding," it is a proper Rule 60(b) motion and should be disposed of as such. *Harris v. United States*, 367 F.3d 74, 82 (2d Cir. 2004) (emphasis omitted).  But where a purported Rule 60(b) motion "attacks the underlying conviction," the court may either "treat the Rule 60(b) motion as a second or successive habeas petition" and transfer it to the Court of Appeals or "deny

---

[11] Musa also sets forth many of the same equitable arguments he made in seeking compassionate release.  Those arguments are no more meritorious in attacking the denial of his habeas petition.

the portion of the motion attacking the underlying conviction as beyond the scope of Rule 60(b)." *Id.* (internal quotation marks and emphasis omitted); *see also Avendano v. United States*, No. 02-cr-1059 (LTS), 2014 WL 7236036, at *2 (S.D.N.Y. Dec. 19, 2014) (holding that a petitioner may not circumvent the limits on successive petitions by "re-labeling [a] section 2255 motion[]" as one for a writ of *audita querela* or *coram nobis*).

Here, Musa's motion is plainly "beyond the scope of Rule 60(b)."  *Harris*, 367 F.3d at 82 (internal quotation marks omitted).  It attacks the fairness of his underlying sentence, not his previous habeas proceeding.  Indeed, Musa's core argument is that his "sentence would be significantly lower today."  (Doc. No. 276 at 6, 13.)  Accordingly, his motion may be dismissed on that ground alone.

But even if the Court could somehow construe Musa's *pro se* motion as challenging the integrity of his previous habeas proceeding, the result would be no different.  As has been made clear time and again, *Holloway*, on which Musa principally relies, does not represent a binding change in the law that would require reopening Musa's previously denied petition.

In *Holloway*, the indictment alleged three separate counts of using a firearm during a crime of violence in violation of 18 U.S.C. § 924(c), each of which carried a consecutive sentence with "onerous enhancements" that greatly increased Holloway's potential prison sentence.  *Holloway*, 68 F. Supp. 3d at 312.  After rejecting a plea offer that would have resulted in the dismissal of two of the three § 924(c) charges, Holloway proceeded to trial and was convicted on all counts.  The district court sentenced him to just under 58 years' incarceration, including a mandatory consecutive sentence of 45 years for the stacked gun counts.  *Id.* at 312–13.  Nineteen years later, in reviewing a motion to reopen Holloway's habeas petition, then-judge Gleeson opined that "there were good reasons to revisit Holloway's excessive sentence but [that there were] no legal avenues

or bases for vacating it." *Id.* at 314.  He therefore requested that the government consider exercising its discretion and agree to vacate at least two of Holloway's § 924(c) counts, which would authorize the court to resentence Holloway to a lower term of imprisonment.  *Id.* Ultimately, the government agreed and moved to vacate two of Holloway's § 924(c) convictions, *id.* at 315, which permitted the court to resentence Holloway to time-served and procured his immediate release from prison, Amended Judgment, *United States v. Holloway*, No. 95-cr-78 (JG) (E.D.N.Y. Aug. 7, 2014), ECF No. 259.[12]

"As multiple district courts have recognized, *Holloway* was not intended to be doctrinal and is not binding on this or any other district court." *United States v. Erskine*, No. 05-cr-1234 (DC), 2017 WL 10751237, at *1 (S.D.N.Y. Aug. 18, 2017) (collecting cases); *see also United States v. Valle*, No. 13-cr-58 (AKH), 2020 WL 729788, at *2 (S.D.N.Y. Feb. 13, 2020).  Moreover, the government has already indicated that it does not intend to dismiss any of Musa's counts of conviction (Doc. No. 286), which refusal is itself fatal to Musa's request, *see United States v. Barnett*, No. 90-cr-913 (LAP), 2020 WL 137162, at *4 (S.D.N.Y. Jan. 13, 2020) (holding that "[i]n the absence of the [g]overnment's approval to grant [*Holloway*] relief, [petitioner's] claim fails"), *appeal docketed*, No. 20-1299 (2d Cir. Apr. 20, 2020).  There is thus no basis for reopening Musa's previously denied habeas petition.[13]

---

[12] Although not technically relevant here, the grounds the government gave for vacating several of Holloway's counts of conviction do not apply to Musa.  Among other reasons, the government noted that Holloway's "record while he's been in the custody of the [BOP] for the last two decades is extraordinary.  He has the mildest of disciplinary records. There are a few infractions, but none of them are violent or involve drugs." *Holloway*, 68 F. Supp. 3d at 315 (internal quotation marks omitted).

[13] In addition, Musa is procedurally ineligible for relief under either a writ of *audita querela* or *coram nobis*.  A writ of *audita querela* exists only to "fill[] 'gaps' in the current systems of postconviction relief." *United States v. Richter*, 510 F.3d 103, 104 (2d Cir. 2007) (quoting *United States v. Valdez-Pacheco*, 237 F.3d 1077, 1079 (9th Cir. 2001)). Where, as here, the claim could have been raised in a 28 U.S.C. § 2255 motion, relief under that writ is unavailable. *See United States v. Mason*, No. 96-cr-126 (JFK), 2019 WL 1594244, at *2 (S.D.N.Y. Apr. 15, 2019).  Nor may Musa seek relief under a writ of *coram nobis* since he is in custody and thus able to "pursue direct review and collateral relief by means of a writ of habeas corpus." *Fleming v. United States*, 146 F.3d 88, 90 (2d Cir. 1998).

### 3.      Musa's New Habeas Petition

Finally, Musa has filed a new *pro se* habeas petition, arguing that his due process and equal protection rights were violated because the prosecutors in his case allegedly subjected him to a § 851 enhancement because of his race.  (Doc. No. 338.)

As a threshold matter, the Court must determine whether it has jurisdiction to entertain Musa's petition, or if such petition is successive and must be directed to the Court of Appeals in the first instance.  As noted above, the mere fact that the Court already adjudicated a prior § 2255 petition to vacate Musa's sentence does not automatically render this a successive petition.  Indeed, a petition that advances a "claim that could not have been raised in a prior petition" may be deemed "first" as to that new claim.  *James*, 308 F.3d at 168 (internal quotation marks omitted).

Musa argues that this is precisely the case here:  he could not have raised a claim concerning racial disparities in connection with § 851 enhancements in his prior petitions because the evidence to support such a claim was simply unavailable until the U.S. Sentencing Commission published its July 2018 Report.  (Doc. No. 338 at 12–14.)  But Musa's argument elides the distinction between, on the one hand, a claim that could not have been raised in a prior petition since a factual predicate to that claim had not yet occurred and, on the other hand, a claim that could have been raised in a prior petition but was not because the defendant lacked access to corroborating evidence or information at that time.  While *James* concerns the former, Musa's petition is an example of the latter.

The distinction between these two types of claims becomes clear by placing the rule announced in *James* in context.  In *James*, the defendant filed a numerically second habeas petition, challenging an allegedly "incorrect application of credit for time served and a miscalculation of [his] conditional release date."  308 F.3d at 168.  The Second Circuit explained that this new claim

was not successive because, at the time of the defendant's first habeas petition, "[t]he present claim had not arisen," since the factual predicate underlying the new claim – the miscalculation of his good-time credit – had not yet occurred and thus could not have been raised earlier. *Id.* ("James could not have argued that he was in custody in violation of the laws of the United States before the time when, according to his calculations, he should have been released, that is, before April 1999. Thus, the present claim had not arisen by 1997, when James filed his first habeas petition.").

By contrast, Musa *could* have raised a selective prosecution claim in his original habeas petition. Indeed, the factual predicate that Musa says supports his claim – that prosecutors have historically filed a disproportionate number of § 851 enhancements against Black offenders – existed when he submitted his first petition. The problem, says Musa, is that those facts were not readily available to him at that time. But, if that is true, then this is simply a case of newly discovered evidence, and the AEDPA is clear that while newly discovered evidence may supply a basis for permitting a defendant to bring a *successive* habeas petition, it does not render that petition "first." *See* 28 U.S.C. § 2255(h)(1) (recognizing an exception to the general bar on successive petitions where the petition is based on "newly discovered evidence"); 28 U.S.C. § 2244(b)(2)(B)(i) (permitting a successive petition to proceed where "the factual predicate for the claim could not have been discovered previously").[14]

Accordingly, the Court concludes that Musa's new petition is successive and therefore must be transferred to the Court of Appeals so that the Second Circuit can determine whether to permit such a petition here.[15] 28 U.S.C. §§ 1631, 2255(h); *see also Liriano v. United States*, 95

---

[14] *See Marmolejos v. United States*, 789 F.3d 66, 70 (2d Cir. 2015) (acknowledging that Congress intended for the rules on successive petitions to operate similarly regardless of whether the petition is made under § 2254 or § 2255).

[15] If permitted to address the petition on the merits, the Court would nonetheless deny it. First, the AEDPA's one-year statute of limitations begins to run from "the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence." 28 U.S.C. § 2255(f)(4). Information identifying

F.3d 119, 123 (2d Cir. 1996) (holding that "when a second or successive . . . § 2255 motion is filed in a district court without . . . authorization[,] . . . the district court should transfer the petition . . . to th[e] [Court of Appeals] in the interest of justice pursuant to § 1631").

### III.  Conclusion

The Court is sympathetic to Musa's application and the obvious disparity between his sentence and those of defendants charged with the same crimes based on similar conduct after 2018.  But other than pointing to the general unfairness of Congress's decision to not make the First Step Act retroactive, Musa has not given the Court sufficient reason to grant his request for compassionate release.  The Court is mindful, however, that Musa's disciplinary record appears to have changed dramatically for the better since 2012, when he says that he overcame his drug addiction.  Therefore, though the Court denies Musa's current application for compassionate release, it does so without prejudice to renewal in the event that Musa continues his recent trajectory of good behavior or the Sentencing Commission issues amendments to the Guidelines that are favorable to Musa's petition.[16]

---

racial disparities in the filing of § 851 enhancements has been available for nearly a decade, most notably in an October 2011 U.S. Sentencing Commission Report – in fact, the disparities identified in that report are *greater* than those identified in the July 2018 Report that Musa cites.  *See* U.S. Sentencing Comm'n, *2011 Report to the Congress: Mandatory Minimum Penalties in the Federal Criminal Justice System* at 256–58, 261    (Oct. 2011), https://www.ussc.gov/research/congressional-reports/2011-report-congress-mandatory-minimum-penalties-federal-criminal-justice-system; *see also United States v. Young*, 960 F. Supp. 2d 881, 906 n.41 (N.D. Iowa 2013); Sarah French Russel, *Rethinking Recidivist Enhancements: The Role of Prior Drug Convictions In Federal Sentencing*, 43 U.C. Davis L.R. 1135, 1169 (2010).  Second, the statistics contained in the Sentencing Commission's reports do not support a selective prosecution claim because they do not demonstrate that the prosecutor in *Musa's* case was motivated by improper reasons.  *See United States v. Hommosany*, 208 F.3d 204 (Table), 2020 WL 254050, at *2 (2d Cir. 2000) (summary order); *United States v. Mangano*, No. 16-cr-540 (JMA), 2018 WL 851860, at *11 n.8 (E.D.N.Y. Feb. 9, 2018).  For one thing, figures collected in 2016 say nothing about the charging decision that occurred in this case, nearly a quarter century earlier.  For another, the disparities that Musa cites are national, and the July 2018 Report acknowledges that § 851 enhancements "were applied inconsistently, with wide geographic variations in the filing." July 2018 Report at 6; *see also id.* at 20–23.  And since only 162 drug offenders were eligible for a § 851 enhancement in the Southern District of New York in 2016, with only 20 such enhancements being filed, *id.* at 48, no meaningful conclusions can be drawn about that office's charging decisions in 2016, let alone twenty-five years earlier in 1991.

[16] But, as alluded to above, the authenticity of the Earwin Letter will likely be relevant to any such future request, and could require an evidentiary hearing at that time.

Accordingly, Musa's motion for compassionate release and his motion to reopen his original habeas petition are DENIED.  The Clerk of Court is respectfully directed to terminate the motions pending at docket numbers 276, 303, 334, and 336 of docket 90-cr-863, and docket numbers 10 and 35 of docket 97-cv-2833.

In addition, the Clerk of Court is respectfully directed to transfer Musa's new, successive habeas petition and request for counsel in aid of that petition, docket numbers 338 and 339 of docket 90-cr-863, and docket numbers 1 and 2 of docket 19-cv-9130, to the United States Court of Appeals for the Second Circuit pursuant to 28 U.S.C. § 1631.  If the Second Circuit authorizes Musa to proceed with his successive petition, he may move to reopen the proceeding under docket number 19-cv-9130.  Lastly, the Clerk of Court is respectfully directed to mail a copy of this order to Musa.

SO ORDERED.

Dated:          November 23, 2020
                New York, New York

_____
Richard J. Sullivan
United States Circuit Judge
Sitting by Designation